In the

 United States Court of Appeals
 For the Seventh Circuit
 ____________________
No. 21-3145
LITTLE SANDY COAL COMPANY, INC.,
 Petitioner-Appellant,
 v.

COMMISSIONER OF INTERNAL REVENUE,
 Respondent-Appellee.
 ____________________

 Appeal from the United States Tax Court.
 No. 17431-17 — James S. Halpern, Judge.
 ____________________

 ARGUED OCTOBER 26, 2022 — DECIDED MARCH 7, 2023
 ____________________

 Before ROVNER, HAMILTON, and BRENNAN, Circuit Judges.
 BRENNAN, Circuit Judge. This case requires us to interpret
the research tax credit under Section 41 of the Internal Reve-
nue Code. To claim the credit, a taxpayer must demonstrate,
among other things, that at least 80 percent of its research ac-
tivities for a business component constituted elements of a
process of experimentation.
 Taxpayer Little Sandy Coal Company, Inc., the parent of a
shipbuilding company, claimed expenses for 11 vessels under
2 No. 21-3145

the tax credit. But the Commissioner of Internal Revenue dis-
allowed the credit and assessed a tax deﬁciency. Taxpayer un-
successfully challenged that decision in tax court.
 We disagree with some aspects of the tax court’s reason-
ing, but ultimately, Taxpayer claimed more tax credit than it
could prove. Taxpayer did not oﬀer a principled way to deter-
mine what portion of the employee activities for each vessel
constituted elements of a process of experimentation, much
less research activities. Instead, Taxpayer relied on arbitrary
estimates and the newness of the vessels. So, we aﬃrm.
 I. Background
 Taxpayer Little Sandy Coal Company, Inc. is the parent of
a shipbuilding company, Corn Island Shipyard, Inc. (CIS), in
southern Indiana. In the tax year ending in June 2014, Tax-
payer claimed a tax credit under Section 41 of the Internal
Revenue Code based on alleged qualiﬁed research expenses
incurred for the design and construction of 11 ﬁrst-in-class
vessels—that is, vessels it had never built before. Taxpayer
claimed employee wages, contract research expenses, and
supply costs for the tax credit. After reviewing Taxpayer’s tax
return, the Commissioner of Internal Revenue disallowed the
tax credit and assessed a tax deﬁciency as well as an accuracy-
related penalty.
 Taxpayer then petitioned for redetermination by the
United States Tax Court, which conducted a ﬁve-day bench
trial. For purposes of trial, the parties agreed to treat two of
the eleven CIS vessels as representative of the others. The two
vessels were a tanker barge, known as Project 720 or the Apex
720 Tanker (Tanker), and a dry dock, known as Project 730 or
the Detyens Dry Dock (Dry Dock).
No. 21-3145 3

 Vessel Development. At trial, the parties oﬀered much testi-
mony on the “iterative process” of designing and constructing
vessels. CIS engineer, Brian Varner, and the Commissioner’s
expert, Kenneth Smith, each referred to the process as a “de-
sign spiral.” They explained that vessel components were in-
terdependent, so the design of some elements could not be
determined until the designs of others were established.
Changes in vessel weight and other metrics could trigger new
calculations and designs for other parts, causing the develop-
ment process to loop back to the drawing board. While engi-
neers “tr[ied] to eliminate problems up front,” the ﬁnal design
of some components could not be determined until construc-
tion. Varner explained that many of these design issues got
“ironed out” as they built the ship, but they still had to feel
“pretty comfortable with a design before … cutting steel.”
“Any repairs or modiﬁcations [could] become very costly very
quickly.”
 Tanker. CIS based the design of the Apex Tanker on a pre-
vious tanker it had built, the Penn 80. But several elements
were diﬀerent. For example, CIS used three-dimensional
modeling to redesign the stern notch, which attaches the
Tanker to a pusher tug. The Tanker also featured a towing bri-
dle that was redesigned to minimize interference with other
vessel components. Designing these components often re-
quired engineering. CIS’s lead engineer and naval architect,
Bud Johnson, performed an engineering calculation—called a
“wind sail” calculation—to determine the appropriate size of
the vessel’s anchor. Others performed engineering calcula-
tions to test the strength of the ship’s longitudinal elements
and to design the tanker’s vapor barrier system, a special coat-
ing to prevent corrosion.
4 No. 21-3145

 Some changes in the Apex Tanker’s design, also deter-
mined through an iterative process, gave it greater cargo ca-
pacity than the Penn 80. After constructing the Tanker, CIS
performed a deadweight survey to measure its water dis-
placement, which indicates its cargo capacity. This displace-
ment is a common contractual speciﬁcation for vessels, and a
suﬃcient variance can result in noncompliance with agreed-
to terms. After analyzing CIS production employees’ time
records, one of its engineering technicians, Brian Meunier, es-
timated that 87% of the time those employees spent construct-
ing the Tanker involved functions “tied directly to items” dif-
ferent from those of the Penn 80.
 Dry Dock. A dry dock is a vessel that can partially sub-
merge in water to raise a ship above water for repairs. CIS had
never built a dry dock before it made the Detyens Dry Dock.
As with the Tanker, CIS used engineering calculations and
modeling to design the Dry Dock and to resolve problems.
CIS drafted several versions of design drawings and per-
formed calculations to test these designs.
 One component, the outboard side plate, went through
ﬁve design revisions. The safety deck also went through sev-
eral versions, one of which involved raising the deck 18 inches
to accommodate changes in the weight of the vessel. After
building the Dry Dock, CIS conducted a partial raise-and-
lower test to ﬁnd out whether the Dry Dock properly
submerged and rose. The client, Detyens, conducted a full
raise-and-lower test after taking delivery.
 Expenses Claimed. For the Tanker, Taxpayer claimed the re-
search tax credit on $2,505,491 of production wages and
No. 21-3145 5

$3,892,142 of supply costs. 1 And for the Dry Dock, Taxpayer
claimed $146,109 of production wages and $1,943,265 of sup-
ply costs.
 Taxpayer also claimed $609,276 in nonproduction “esti-
mated wage expenses” for the 11 vessels. These expenses
were not broken out by vessel, but some of the wages were
attributable to speciﬁc employees: $173,996 to Bud Johnson,
CIS’s lead engineer and naval architect; $126,734 to CIS’s
management, Don Foertsch, David Foertsch, and Alan
Fleischmann; and $56,895 to draftsmen, Dennis Gass, Kyle
Harpenau, and Robert Kellems. Taxpayer calculated these
nonproduction wages by applying to each employee’s total
wages an allocation percentage equal to the estimated portion
of the employee’s time spent on qualiﬁed research. Some trial
witnesses testiﬁed that these estimates were reasonable. For
example, Meunier testiﬁed that 60% is a “reasonable” alloca-
tion for the time Johnson spent on the design and develop-
ment of the 11 vessels. David Foertsch similarly attested that
the percentage estimations of time various employees spent
on these vessels were “fair.”
 After trial, the tax court found that Taxpayer was not enti-
tled to claim the research credit for any of the 11 vessels. The
tax court upheld the tax deﬁciency and the accuracy-related

 1 Taxpayer also claimed $17,504 in contract research expenses that are

not at issue here. CIS paid Hayes Testing Labs to test some welds made in
the Tanker’s construction. The tax court found that this activity was
excluded from the credit as the amounts CIS paid to Hayes were neither
research nor experimental expenditures. Taxpayer did not address these
expenses in its opening brief, so it waived argument on whether they are
creditable. Accident Fund Ins. Co. of Am. v. Custom Mech. Constr., Inc., 49
F.4th 1100, 1108 (7th Cir. 2022).
6 No. 21-3145

penalty. Taxpayer timely appealed to this court under I.R.C.
§ 7482(a)(1).
 II. Statutory & Regulatory Framework
 Before we consider the parties’ arguments, we review the
research tax credit and how it works. This includes examining
what are qualiﬁed research expenses (including what quali-
ﬁes as research); the Section 174 test, which allows research
and experimental expenditures that taxpayers would other-
wise capitalize to be deducted from taxable income; and the
process of experimentation test and its components.
 A. Research Tax Credit
 Section 41 of the Internal Revenue Code provides a tax
credit for 20% of “qualiﬁed research expenses” that exceed a
prescribed base amount. I.R.C. § 41(a)(1). The statute is com-
plex and has several nested deﬁnitions. We discuss only the
relevant provisions.
 Qualiﬁed Research Expenses. Qualiﬁed research expenses in-
clude “in-house research expenses” and “contract research
expenses.” § 41(b)(1). “[I]n-house research expenses” include
“wages paid or incurred to an employee for qualiﬁed ser-
vices” and “any amount paid or incurred for supplies used in
the conduct of qualiﬁed research.” § 41(b)(2)(A)(i)–(ii).
“Qualiﬁed services” in turn “means services consisting of—
(i) engaging in qualiﬁed research, or (ii) engaging in the direct
supervision or direct support of research activities which con-
stitute qualiﬁed research.” § 41(b)(2)(B). Qualiﬁed research
expenses are broad. They include, among other things, the
cost of supplies used for qualiﬁed research as well as wages
for direct supervision and support of qualiﬁed research.
§ 41(b)(2). Whether such supply costs and wages are qualiﬁed
No. 21-3145 7

research expenses depends on whether the taxpayer has per-
formed “qualiﬁed research” as deﬁned in Section 41(d).
 Qualiﬁed Research. To constitute qualiﬁed research, the re-
search activities must satisfy four tests in Section 41(d)(1):
(1) the Section 174 test, (2) the technological information test,
(3) the business component test, and (4) the process of exper-
imentation (or “substantially all”) test. § 41(d)(1); Union Car-
bide Corp. & Subs. v. Comm’r, 97 T.C.M. (CCH) 1207, T.C.
Memo. 2009-50, at *77 (2009), aﬀ’d, 697 F.3d 104 (2d Cir. 2012).
First, under the Section 174 test, the expenditures for the
research must be deductible “research or experimental ex-
penditures” under I.R.C. § 174. § 41(d)(1)(A). Second, the
technological information test requires the research to be “un-
dertaken for the purpose of discovering information … which
is technological in nature.” § 41(d)(1)(B)(i). Third, under the
business component test, the application of the research must
be “intended to be useful in the development of a new or im-
proved business component of the taxpayer.” § 41(d)(1)(B)(ii).
Fourth, substantially all of the research activities must consti-
tute elements of a process of experimentation for the purpose
of “(i) a new or improved function, (ii) performance, or
(iii) reliability or quality.” § 41(d)(1)(C), (3)(A).
 These four tests are initially applied at the “business com-
ponent” level. § 41(d)(2)(A); Treas. Reg. § 1.41–4(b)(2).
“‘[B]usiness component’ means any product, process, com-
puter software, technique, formula, or invention which is to
be—(i) held for sale, lease, or license, or (ii) used by the tax-
payer in a trade or business of the taxpayer.” § 41(d)(2)(B). If
a business component fails any of the qualiﬁed research tests,
we follow the “shrinking-back rule” and apply the tests at the
“most signiﬁcant subset” of the business component.
8 No. 21-3145

§ 1.41-4(b)(2). Failing that, the shrinking-back rule is applied
to smaller subcomponents until “either a subset of elements
of the product that satisﬁes the requirements is reached, or the
most basic element of the product is reached and such ele-
ment fails to satisfy the test.” Id. Only the fourth “process of
experimentation” test and indirectly the ﬁrst test under Sec-
tion 174 are in dispute here, so we elaborate on them, the latter
ﬁrst.
 B. Section 174 Test
 Section 174 allows research and experimental expendi-
tures that taxpayers would otherwise capitalize to be de-
ducted from taxable income. I.R.C. § 174(a)(1); Union Carbide,
T.C. Memo. 2009-50, at *78. “The term research or experimental
expenditures, as used in section 174, means expenditures in-
curred in connection with the taxpayer’s trade or business
which represent research and development costs in the exper-
imental or laboratory sense.” Treas. Reg. § 1.174-2(a)(1). “Ex-
penditures represent research and development costs in the
experimental or laboratory sense if they are for activities in-
tended to discover information that would eliminate uncer-
tainty concerning the development or improvement of a
product.” Id. And “[u]ncertainty exists if the information
available to the taxpayer does not establish the capability or
method for developing or improving the product or the ap-
propriate design of the product.” Id. “Whether an uncertainty
exists is an objective test that depends on the information
available to the taxpayer.” Union Carbide, T.C. Memo. 2009-50,
at *78 (citing Mayrath v. Comm’r, 41 T.C. 582, 590–91 (1964),
aﬀ’d, 357 F.2d 209 (5th Cir. 1966)).
 “Because the taxpayer need only be uncertain as to ‘the ca-
pability or method … or the appropriate design’ of the
No. 21-3145 9

improvement, an uncertainty may exist even if the taxpayer
knows that it is technically possible to achieve a goal but is
uncertain of the method or appropriate design to use to reach
that goal.” Id. at *78 (quoting § 1.174-2(a)(1) (emphasis
added)). “Whether expenditures qualify as research or exper-
imental expenditures depends on the nature of the activity to
which the expenditures relate, not the nature of the product
or improvement being developed or the level of technological
advancement the product or improvement represents.”
§ 1.174-2(a)(1). In all cases, expenses deductible under Section
174 exclude “costs paid or incurred in the production of a
product after the elimination of uncertainty.” § 1.174-2(a)(2).
 Uncertainty. It is critical to correctly frame “uncertainty” in
Section 1.174-2 because, as explained later, this same concept
undergirds the process of experimentation test. Generic un-
certainty is inherent in constructing or manufacturing a prod-
uct. That involves questions like: Will this tire ﬁt? What kind
of screws are needed to attach this panel? Or will this weld
hold up this truss? But “uncertainty” in Section 174 means
something more. “[D]eductions under section 174 are limited
to ‘expenditures of an investigative nature expended in devel-
oping the concept of a model or product,’ as opposed to the
construction or manufacture of the product itself.” Union Car-
bide, T.C. Memo. 2009-50, at *79 (citation omitted) (quoting
Mayrath, 41 T.C. at 590). Expenses incurred merely to deter-
mine whether a product is built to satisfy a client’s desired
speciﬁcations—without any indication that the expenses were
incurred to improve or develop the concept of the product—
do not qualify.
 That is why the regulations exclude expenses for “ordi-
nary testing or inspection of materials or products for quality
10 No. 21-3145

control (quality control testing).” § 1.174-2(a)(6)(i). Quality
control testing refers to “testing or inspection to determine
whether particular units of materials or products conform to
speciﬁed parameters.” § 1.174-2(a)(7). Still, “quality control
testing does not include testing to determine if the design of
the product is appropriate.” Id. But the “design”—if expendi-
tures for it are to be deducted under Section 174—cannot just
be any design or modiﬁcation to meet customer speciﬁca-
tions. The design must be intended to remove the correct type
of uncertainty: that related to the “development or improve-
ment” of the product. § 1.174-2(a)(1).
 We read “development” as used in Section 1.174-2(a)(1) to
refer to more than mere construction (as in the common par-
lance of “real estate development”). The plain meaning of
“development” is the “action or process of bringing some-
thing to a … more advanced condition”— embracing the idea
of “improvement”—but it can also mean general “change” or
“progression by successive stages.” Development, OXFORD
ENGLISH DICTIONARY (3d ed. 2016), https://www.oed.com/
view/Entry/51434?redirectedFrom=development#eid; see also
Develop, WEBSTER’S THIRD NEW INTERNATIONAL DICTIONARY
(1993) (“cause to increase or improve”). The former definition
fits better in context. “Development,” as used beside “im-
provement,” implies an advancement in technology or prod-
uct concept. See § 1.174-2(a)(1); ANTONIN SCALIA & BRIAN A.
GARNER, READING LAW 195 (2012) (“Associated words bear on
one another’s meaning (noscitur a sociis).”). Granted, whether
expenses are deductible under Section 174 depends on activi-
ties covered by the expenditures, and not on the level of
technological advancement. See § 1.174-2(a)(1). But while the
degree of technological advancement may not matter, the
No. 21-3145 11

goal of the research activity must still be development or im-
provement.
 “The presence of uncertainty concerning the development
or improvement of certain components of a product does not
necessarily indicate the presence of uncertainty concerning
the development or improvement of other components of the
product or the product as a whole.” § 1.174-2(a)(5). So even if
research expenditures furthered the advancement of some
parts of a product, other expenses to build other parts of that
product may not be deductible under Section 174. Generic
manufacturing or construction uncertainty for the other parts
will not suﬃce. Put a diﬀerent way, a manufacturer may not
simply “add a few new bells and whistles” on a pre-existing
product and claim uncertainty as to the whole. If summed up
in one word, expenses deductible under Section 174 must be
“investigative.” Union Carbide, T.C. Memo. 2009-50, at *79
(quoting Mayrath, 41 T.C. at 590).
 C. Process of Experimentation Test
 The fourth test to constitute qualiﬁed research, the process
of experimentation test, has two components: (1) substan-
tially all the research activities must constitute elements of a
process of experimentation, and (2) for a qualiﬁed purpose
under Section 41(d)(3)(A). § 41(d)(1)(C). The Commissioner
does not dispute the tax court’s ﬁnding that CIS designed the
Tanker and Dry Dock for proper purposes such as: “a new or
improved function,” “performance,” or “reliability or qual-
ity.” § 41(d)(3)(A). Only the “substantially all” fractional de-
termination is in dispute.
 Substantially All. By regulation, “[t]he substantially all re-
quirement of section 41(d)(1)(C) … is satisﬁed only if 80
12 No. 21-3145

percent or more of a taxpayer’s research activities, measured
on a cost or other consistently applied reasonable basis …
constitute elements of a process of experimentation.” Treas.
Reg. § 1.41-4(a)(6). Accordingly, the “substantially all” frac-
tion is:
 Research activities that constitute
 elements of a process of experimentation
 Research activities
See id.; § 41(d)(1)(C). The regulations explain what is meant by
the generic denominator “research activities.” The penulti-
mate sentence of Section 1.41-4(a)(6) reads:
 Accordingly, if 80 percent (or more) of a tax-
 payer’s research activities with respect to a busi-
 ness component constitute elements of a pro-
 cess of experimentation for a purpose described
 in section 41(d)(3), the substantially all require-
 ment is satisﬁed even if the remaining 20 per-
 cent (or less) of a taxpayer’s research activities
 with respect to the business component do not
 constitute elements of a process of experimenta-
 tion for a purpose described in section 41(d)(3),
 so long as these remaining research activities satisfy
 the requirements of section 41(d)(1)(A) and are not
 otherwise excluded under section 41(d)(4).
§ 1.41-4(a)(6) (emphasis added).
 This italicized portion clariﬁes that any non-“process of
experimentation” research activities must “satisfy the re-
quirements of section 41(d)(1)(A)” and not be “otherwise ex-
cluded under section 41(d)(4).” Id.; see also Union Carbide, T.C.
Memo. 2009-50, at *80; Suder v. Comm’r, 108 T.C.M. (CCH) 354,
T.C. Memo. 2014-201, at *17 (2014). An example in the
No. 21-3145 13

regulation reaﬃrms this requirement. § 1.41-4(a)(8), Ex. 4 (re-
peating italicized language above). Because Section
41(d)(1)(A) cross-references Section 174, the proper “substan-
tially all” fraction becomes:
 Research activities that constitute
 elements of a process of experimentation
 Research activities not excluded under Section 41(d)(4)
 and whose expenses are deductible under Section 174
See § 1.41-4(a)(6).
 Denominator. The “research activities” in the denominator
must not be excluded under Section 41(d)(4) and expendi-
tures for such activities must also be deductible under Section
174. Section 41(d)(4) excludes certain research activities from
“qualiﬁed research” including: research conducted after the
commercial production of a business component,
§ 41(d)(4)(A); research to adapt an existing business compo-
nent to a particular customer’s speciﬁcations, § 41(d)(4)(B);
and research to duplicate an existing business component,
§ 41(d)(4)(C). We need not discuss the other exceptions.
§ 41(d)(4)(D)–(H).
 Numerator—Elements of a Process of Experimentation. More
importantly, the numerator—a subset of the denominator—
also requires that the research activities “constitute elements of
a process of experimentation.” § 41(d)(1)(C) (emphasis
added). Thus, the numerator is broad enough to encompass
research activities that are not per se experimentation or test-
ing. And “a process of experimentation is a process designed
to evaluate one or more alternatives to achieve a result where
the capability or the method of achieving that result, or the
appropriate design of that result, is uncertain as of the begin-
ning of the taxpayer’s research activities.” § 1.41–4(a)(5)(i). “A
14 No. 21-3145

process of experimentation … involves the identiﬁcation of
uncertainty concerning the development or improvement of
a business component … .” Id. “The ‘uncertainty’ element of
this test is essentially the same uncertainty as is required by
the section 174 test, and the test may be satisﬁed even if the
taxpayer is certain of either the capability or method of
achieving the desired goal if the appropriate design of the de-
sired result is uncertain at the outset.” Union Carbide, T.C.
Memo. 2009-50, at *80 (footnote omitted) (citing §§ 1.174-
2(a)(1), 1.41–4(a)(5)(i)); see also Siemer Milling Co. v. Comm’r,
117 T.C.M. (CCH) 1196, T.C. Memo. 2019-37, at *8 (2019). As
hinted earlier, our prior conclusions on “uncertainty” for the
Section 174 test also apply for the process of experimentation
test.
 This raises the question: Is there daylight between the Sec-
tion 174 and process of experimentation tests? The answer is
“yes.” While both tests are aimed at removing the same type
of uncertainty concerning the development or improvement
of a business component, the process of experimentation “test
also imposes a more structured method of discovering infor-
mation than section 174 requires and may not include all ac-
tions a taxpayer takes to resolve uncertainty.” Union Carbide,
T.C. Memo. 2009-50, at *80 (citing Norwest Corp. & Subs. v.
Comm’r, 110 T.C. 454, 496 (1998) and Eustace v. Comm’r, 312
F.3d 905, 907 (7th Cir. 2002)). “A process of experimentation
must fundamentally rely on the principles of the physical or
biological sciences, engineering, or computer science.” § 1.41–
4(a)(5)(i). It “involves the identiﬁcation of uncertainty con-
cerning the development or improvement of a business com-
ponent, the identiﬁcation of one or more alternatives intended
to eliminate that uncertainty, and the identiﬁcation and the
conduct of a process of evaluating the alternatives (through,
No. 21-3145 15

for example, modeling, simulation, or a systematic trial and
error methodology).” Id.
 This process requires the use of the scientiﬁc method to
resolve the uncertainty. Union Carbide, T.C. Memo. 2009-50, at
*81. By scientiﬁc method, we mean “[a]n analytical technique
by which a hypothesis is formulated and then systematically
tested through observation and experimentation.” Id. (citing
Scientiﬁc method, BLACK’S LAW DICTIONARY (8th ed. 2004)). “To
satisfy the process of experimentation test, the taxpayer
should develop a hypothesis as to how a new alternative
might be used to develop a business component, test that hy-
pothesis in a scientiﬁc manner, analyze the results of the test,
and then either reﬁne the hypothesis or discard it and develop
a new hypothesis and repeat the previous steps.” Id. at *81.
 A process of experimentation “must involve a methodical
plan involving a series of trials to test a hypothesis, analyze
the data, reﬁne the hypothesis, and retest the hypothesis so
that it constitutes experimentation in the scientiﬁc sense.” Id.
at *81; Siemer Milling, T.C. Memo 2019–37, at *8. “Testing and
reﬁning a hypothesis may involve determining the strengths
and weakness of the alternative tested, whether and how the
process could be further reﬁned and improved, and whether
other alternatives might be better suited for achieving the tax-
payer’s goal.” Union Carbide, T.C. Memo. 2009-50, at *81 And
while only one alternative need be identiﬁed and evaluated, a
process of experimentation “generally should be capable of
evaluating more than one alternative.” Id.; § 1.41–4(a)(5)(i).
 III. Discussion
 With this factual background and statutory and regulatory
overview, we move to analysis of the case.
16 No. 21-3145

 “Tax credits are a matter of legislative grace, are only al-
lowed as clearly provided for by statute, and are narrowly
construed.” United States v. McFerrin, 570 F.3d 672, 675 (5th
Cir. 2009) (citing Stinson Est. v. United States, 214 F.3d 846, 848
(7th Cir. 2000)); see also VHC, Inc. v. Comm’r, 968 F.3d 839, 841
(7th Cir. 2020). “In this case, as with all claimed tax credits,
the taxpayer bears the burden of showing entitlement to the
credit.” United Stationers, Inc. v. United States, 163 F.3d 440, 443
(7th Cir. 1998). “A taxpayer claiming a credit under section 41
must retain records in suﬃciently usable form and detail to
substantiate that the expenditures claimed are eligible for the
credit.” § 1.41-4(d); see also I.R.C. § 6001; Treas. Reg. § 1.6001–
1(a), (e). To the extent that the taxpayer’s entitlement to the
research tax credit turns on a legal interpretation, we review
the tax court’s legal determinations de novo. Carter v. Comm’r,
746 F.3d 318, 321 (7th Cir. 2014) (citation omitted). But as to
ﬁndings of fact supporting that determination, including
ﬁndings of evidentiary suﬃciency, we review for clear error.
Wegbreit v. Comm’r, 21 F.4th 959, 963 (7th Cir. 2021).
 If a taxpayer can establish that qualiﬁed research occurred,
we may estimate the qualiﬁed research expenses subject to the
tax credit. See McFerrin, 570 F.3d at 679 (citing Cohan v.
Comm’r, 39 F.2d 540, 544 (2d Cir. 1930)). But this estimate re-
lates to Section 41(b), which is a separate—albeit related—in-
quiry from Section 41(d). Only after a taxpayer establishes
that qualiﬁed research has occurred under Section 41(d) may
we estimate, if needed, the amount of qualiﬁed research ex-
penses under Section 41(b). Shami v. Comm’r, 741 F.3d 560, 568
(5th Cir. 2014) (“[T]he Cohan rule is not implicated unless the
taxpayer proves that he is entitled to some amount of tax ben-
eﬁt.”). Because Taxpayer failed to satisfy the process of
No. 21-3145 17

experimentation test in Section 41(d), we conclude that no
qualiﬁed research expenses are creditable under Section
41(b).
 To reach this conclusion, we explain where we agree with
the tax court, we review the pilot model production expenses,
and then we review Taxpayer’s failure of proof.
 A. Where We Agree with the Tax Court
 The tax court is correct in several of its conclusions.
 “Substantially All” Fraction. The tax court properly con-
strued the “substantially all” fraction for Section 41(d)(1)(C).
As we did earlier, the tax court backed into the deﬁnition of
the denominator, “research activities,” by using the parame-
ters that the regulations imposed on non-“process of experi-
mentation” research activities. See generally § 1.41-4(a)(6) &
(a)(8), Ex. 4. Recall that the correct fraction is research activi-
ties that constitute elements of a process of experimentation
divided by research activities not excluded under Section
41(d)(4) and whose expenses are deductible under Section
174.
 Novelty Approach. The tax court also rightly rejected Tax-
payer’s novelty argument, namely, that because the majority
of the Tanker and Dry Dock was new, substantially all of the
activities in designing the vessels constituted elements of a
process of experimentation. As it did before the tax court, Tax-
payer repeatedly emphasizes that the eleven vessels in ques-
tion were ﬁrst-in-class and that Taxpayer had never built a dry
dock before. But the tax court correctly recognized that “Sec-
tion 1.41-4(a)(6) … requires that the substantially all test be
applied in reference to activities—not physical elements of the
business components being developed or improved.” So
18 No. 21-3145

novelty of the business component cannot be the basis for
measuring the proportion of research activities that consti-
tuted elements of a process of experimentation. See
§ 1.41-4(a)(6) (“substantially all of the activities must consti-
tute elements of a process of experimentation”).
 This “feels new enough” approach was used in Trinity In-
dus., Inc. v. United States, 691 F. Supp. 2d 688 (N.D. Tex. 2010),
aﬀ’d, 757 F.3d 400 (5th Cir. 2014). That case also involved a
shipbuilder who built several vessels, and the district court
found the expenses incurred for two of six vessels to be qual-
iﬁed research expenses. Id. at 690, 694–97. For example, the
district court found that research expenses incurred for “a
very innovative special operations deployment craft … de-
signed to be very fast, undetectable, and able to ﬁt on a C–5
cargo plane for rapid deployment” were qualiﬁed research
expenses based on the vessel’s novelty. Id. at 694. But like the
stealth ship in question, the court evaded the mandate in Sec-
tions 41(d)(1)(C) and 1.41-4(a)(6) to determine whether the
percentage of research activities exceed 80%. Rather, it used
novelty as a shortcut. True, the regulation says courts may
make this determination “on a cost or other consistently ap-
plied reasonable basis.” § 1.41-4(a)(6). But the novelty of a
business component is not one such “other consistently ap-
plied reasonable basis.” Id. The Trinity Industries court said it
did “not intend to enumerate everything about the [ship] that
was new and required research expenditures.” 691 F. Supp.
2d at 694. It was loath to follow the government’s suggestion
that “the [c]ourt should scour the records and determine
which [expense] line items are for matters not properly con-
sidered [qualiﬁed research expenses].” Id. at 697. Instead, the
district court used the heuristic of newness to bypass
No. 21-3145 19

statutory and regulatory directives. Like the tax court, we re-
ject the novelty approach used in Trinity Industries.
 Component-level Analysis. Taxpayer asserts that the tax
court erred by applying the process of experimentation test at
a subcomponent level as opposed to the claimed business
component level. But this gets it backward: The tax court ex-
plicitly applied the “substantially all” test at the business
component—that is, vessel—level. In fact, the tax court said
that it could not apply the shrinking-back rule contained in
Section 1.41-4(b)(2) to see if the “substantially all” test is met
for a subcomponent of either vessel. This was because Tax-
payer had chosen an “all or nothing” strategy in claiming the
development of entire vessels—as opposed to smaller compo-
nents—as qualiﬁed research. So the court could not perform
the Section 174 and process of experimentation tests under-
neath the vessel level, even though it observed that some of
Taxpayer’s activities with respect to certain subcomponents
could involve a process of experimentation.
 We recognize also that the Tanker’s stern notch and tow-
ing bridle, as well as the Dry Dock’s outboard side plate,
among other elements, went through several design itera-
tions. The research activities to develop these parts may very
well constitute elements of a process of experimentation. But,
as we revisit later, Taxpayer’s documentation lacks the neces-
sary detail to prove that. It is Taxpayer’s burden to show enti-
tlement to the research tax credit and to retain records to
substantiate eligibility for the credit. United Stationers, 163
F.3d at 443; § 1.41-4(d); see also § 6001; § 1.6001–1(a), (e). Other
taxpayers seeking to avail themselves of the research tax
credit would be well-advised to document research activities
20 No. 21-3145

for subcomponents if they cannot demonstrate a process of
experimentation at the business component level.
 B. Pilot Model Production Expenses
 While we agree with the tax court’s ultimate conclusions,
we disagree in part with its treatment of pilot model produc-
tion expenses. As in the tax court, Taxpayer contends that the
Tanker and Dry Dock are “pilot models,” as deﬁned by Sec-
tion 1.174-2(a)(4). It argues therefore that production wages
for making such models categorically qualify as research ac-
tivities that constitute elements of a process of experimenta-
tion. The tax court did not determine that either vessel was a
pilot model. Rather, for purposes of the “substantially all”
analysis, the court alternatively assumed that the vessels were
and were not pilot models. We follow this same approach. But
ﬁrst, we consider the interplay between pilot model produc-
tion expenses and the components of the “substantially all”
fraction.
 1. Deductible Under Section 174
 Assuming that the two vessels were pilot models, the tax
court properly included pilot model production expenses into
the denominator. “Pilot model” is a deﬁned term for purposes
of research expense deductibility under Section 174. It means
“any representation or model of a product that is produced to
evaluate and resolve uncertainty concerning the product dur-
ing the development or improvement of the product.”
§ 1.174-2(a)(4). So the creator’s intent matters. And “pilot
model” is included in the deﬁnition of “product.”
§ 1.174-2(a)(3). Recall that “research or experimental expend-
itures” deductible under Section 174 include those expended
for “activities intended to discover information that would
No. 21-3145 21

eliminate uncertainty concerning the development or
improvement of a product.” § 1.174-2(a)(1). Because pilot
models by deﬁnition are “produced to evaluate and resolve
uncertainty concerning the product during the development
or improvement of the product,” pilot model production ex-
penses incurred prior to the elimination of uncertainty are de-
ductible under Section 174. § 1.174-2(a)(2), (4). It follows that
pilot model production expenses are included in the denomi-
nator of the “substantially all” fraction. Cf. § 1.41–4(a)(6) (“so
long as these remaining research activities satisfy the require-
ments of section 41(d)(1)(A)”—that is, Section 174).
 This conclusion is buttressed by the examples provided in
Section 1.174-2(a)(11). These examples also demonstrate that
the way pilot model production expenses factor into the re-
search and development process depends on the industry in
question. Two of the examples illustrate the diﬀerence be-
tween pilot models for custom-made versus mass-produced
products: In Example 3, a custom manufacturer, U, contracts
to produce a custom machine based on a client’s speciﬁca-
tions. § 1.174-2(a)(11), Ex. 3. U incurs a total of $31,000 on the
project, $10,000 of which is for “materials and labor to pro-
duce a model that is used to evaluate and resolve the uncer-
tainty concerning the appropriate design.” Id. $1,000 is for
“using the model to test whether certain features can be inte-
grated into the design of the machine.” Id. “After uncertainty
is eliminated, U incurs $20,000 to produce the machine for
sale to the customer based on the appropriate design.” Id. Of
the $31,000, only “the $10,000 incurred to produce the model
and the $1,000 incurred on design testing activities qualiﬁes
as research or experimental expenditures under section 174.”
Id. Example 3 states that expenses incurred in producing a
model to resolve uncertainty concerning the appropriate
22 No. 21-3145

design of a custom-made product are deductible under Sec-
tion 174. So the same expenses would also be included in the
“substantially all” denominator. This example is analogous to
the tailor-made shipbuilding industry in this case. But unlike
in our circumstances, in the example the divide between pre-
uncertainty and post-uncertainty expenses is well-deﬁned.
 In Example 5, a mass-production manufacturer, V, “incurs
$5,000 to produce a number of models of the product that are
to be used in testing the appropriate design before the prod-
uct is mass-produced for sale.” § 1.174-2(a)(11), Ex. 5. “Multi-
ple models are necessary to test the design in a variety of
diﬀerent environments (exposure to extreme heat, exposure
to extreme cold, submersion, and vibration).” Id. All $5,000
are deductible under Section 174. Id. Example 5 is the “crash
test” scenario in which a manufacturer produces multiple pi-
lot models and subjects them to a variety of tests in order to
reﬁne the product for mass production. This example also in-
volves a deﬁnite separation between the “pilot” or develop-
mental phase and the post-uncertainty production phase of a
manufacturing project. The same is true for Examples 4 and
6, which involve the redesign of a product part and the devel-
opment of a new part, respectively. See § 1.174-2(a)(11), Exs. 4,
6. In our case, the line at which uncertainty ends for each ves-
sel is hazy, and that is problematic as a matter of proof for
both the denominator and numerator of the “substantially
all” fraction.
 In Examples 7 and 8, the research is performed to develop
a new line of product rather than to fulﬁll existing contractual
obligations. § 1.174-2(a)(11), Exs. 7 (vertical take-oﬀ aircraft),
8 (new type of compressor blade for an aircraft engine). So all
experimental expenses in producing and testing the models
No. 21-3145 23

are deductible expenses under Section 174. Id. Here, Tax-
payer’s alleged research activities were performed, ﬁrst and
foremost, to fulﬁll a contractual obligation. Now, that does
not mean that a taxpayer cannot have a dual intent of contrac-
tual fulﬁllment and innovation. Taxpayer could have
produced the Tanker and Dry Dock “to evaluate and resolve
uncertainty concerning the product[s] during the develop-
ment or improvement of the product[s].” § 1.174-2(a)(4). That
is, they could be pilot models. Ultimately, we need not resolve
that question because, whether or not the vessels are pilot
models, Taxpayer failed to demonstrate that the production
and nonproduction wages for each vessel account for ele-
ments of a process of experimentation—the numerator in the
“substantially all” fraction.
 2. Elements of a Process of Experimentation
 At this point, our analysis diverges from that of the tax
court. In entertaining the possibility that the vessels were pilot
models, the tax court also categorically excluded model pro-
duction wages from the numerator of the “substantially all”
fraction. That is, it found that pilot model production activi-
ties could not be an element of a process of experimentation.
In so concluding, the tax court erroneously imported a dis-
tinction from Section 41(b)(2)(B) into the numerator of the
fraction in Section 41(d)(1)(C). The court ﬁrst observed the
distinction that Section 41(b)(2)(B) draws between “direct
support of research activities which constitute qualiﬁed re-
search,” § 41(b)(2)(B)(ii), and “qualiﬁed research,”
§ 41(b)(2)(B)(i). Pilot model production, the court then rea-
soned, directly supported research activities but did “not
have a close enough nexus to the testing to be considered
qualiﬁed research in its own right.” Accordingly, the tax court
24 No. 21-3145

concluded that activities in “direct support of research activi-
ties which constitute qualiﬁed research,” § 41(b)(2)(B)(ii),
including any pilot model production activities, are categori-
cally not qualiﬁed research or elements of a process of exper-
imentation.
 Other courts have drawn similar distinctions. E.g., Shami,
741 F.3d at 570 (“In short, the supervisor of the direct super-
visor of employees who conduct qualiﬁed research is not
himself engaged in qualiﬁed research.”). The regulation ex-
pounding upon Section 41(b)—the scope of qualiﬁed research
expenses—states, “direct support of research includes the ser-
vices … of a machinist for machining a part of an experi-
mental model used in qualiﬁed research.” § 1.41-2(c)(3)(ii).
And Section 41(b)(2)(B)(ii) distinguishes direct support and
supervision of qualiﬁed research from qualiﬁed research it-
self. So, it would make sense that pilot model production ex-
penses have no part in the “qualiﬁed research” deﬁned by
Section 41(d). See generally ANTONIN SCALIA & BRIAN A.
GARNER, READING LAW 167 (2012) (explaining the whole-text
canon). While that reading may be sensible, it is incorrect for
reasons we will explain.
 Within the “substantially all” fraction in Section
41(d)(1)(C), we see the text justifying two options as to how
we can treat activities that would qualify as “direct support”
and “direct supervision” under Section 41(b)(2)(B)(ii). Either
direct support and supervision activities should be consid-
ered in both the numerator and denominator of the fraction
as Taxpayer proposes, or they should not be considered at all
as the amicus curiae, the National Association of
No. 21-3145 25

Manufacturers, suggests. 2 The tax court took a third approach
and suggested direct support and supervision activities—
more speciﬁcally, pilot model production activities—could be
included in the denominator, but the court categorically ex-
cluded them from the numerator.3 We conclude that the ﬁrst
approach, advocated by Taxpayer, is correct.
 If we were to rule for the second option—to carry over the
Section 41(b) distinction between qualiﬁed research and di-
rect support/supervision into Section 41(d)—then production
activities that support qualiﬁed research would not belong in
the “substantially all” fraction. For the reasons stated earlier,
this approach is internally inconsistent. But applying the Sec-
tion 41(b) distinction in Section 41(d) comes with more prob-
lems of its own. For one, neither the terms nor the concept of
“direct support” or “direct supervision” appears in Section
41(d).

 2 We thank the National Association of Manufacturers for its well-rea-

soned and helpful amicus brief.
 3 Consider the practical import of the tax court’s categorical exclusion

of pilot model production expenses from the numerator. Under the tax
court’s reasoning, the more costly the production expenses for developing
a pilot model, the less likely that a taxpayer can fulfill the “substantially
all” test. Obviously, pilot model production expenses can vary widely de-
pending on what is being modeled. For example, producing models of a
plastic fork is much cheaper than making models of a fully functional
automobile. If we include such model production expenses in the “sub-
stantially all” denominator but categorically exclude them from the
numerator, as the tax court suggests, the satisfaction of the test would de-
pend on how small the pilot model production expenses are relative to the
nonproduction research expenses. It escapes reason why the “substan-
tially all” test should depend on how expensive it is to produce the pilot
model.
26 No. 21-3145

 More broadly, Section 41(b) and Section 41(d) address dif-
ferent subjects: Section 41(b) identiﬁes the contours of quali-
ﬁed research expenses subject to the research tax credit under
Section 41. It includes amounts spent on supplies for and
wages in direct support or supervision of qualiﬁed research.
§ 41(b)(2)(A)(ii), (B)(ii). By contrast, Section 41(d) deals with
qualiﬁed research activities. See § 41(d)(1)(C) (“research …
substantially all of the activities of which constitute elements
of a process of experimentation”). The “substantially all” frac-
tion in Section 41(d)(1)(C) excludes supply costs for research,
but the denominator includes research activities not excluded
under Section 41(d)(4) and whose expenses are deductible un-
der Section 174. § 1.41-4(a)(6). So Section 41(d) is narrower in
some respects, but broader in others, than Section 41(b). Qual-
iﬁed research expenses and qualiﬁed research are diﬀerent—
albeit related—concepts, and they have separate regulations
explaining each. See §§ 1.41-2, 1.41-4. As explained next, im-
porting a distinction from Section 41(b) into Section 41(d) pre-
sents conﬂicts with existing regulations expounding upon
Section 41(d).
 Nothing in the regulation explaining Section 41(d)—Sec-
tion 1.41-4—explicitly addresses pilot models. Recall, though,
that “pilot model” means “any representation or model of a
product that is produced to evaluate and resolve uncertainty
concerning the product during the development or improve-
ment of the product.” § 1.174-2(a)(4). And the “uncertainty”
element of the process of experimentation test is the same as
that of the Section 174 test. Union Carbide, T.C. Memo. 2009-
50, at *80 (footnote omitted) (citing §§ 1.174-2(a)(1),
1.41-4(a)(5)(i)). If a pilot model, by deﬁnition, is produced to
resolve the correct type of uncertainty, it would be odd that
pilot model production activities should not constitute
No. 21-3145 27

research activities deductible under Section 174. So the second
approach is at odds with the deﬁnition of “pilot model.” Fur-
ther, if the pilot model was used to evaluate alternatives as
part of a “methodical plan involving a series of trials to test a
hypothesis,” the model production activities would also con-
stitute elements of a process of experimentation. Siemer Mill-
ing, T.C. Memo 2019–37, at *8. This casts doubt on the tax
court’s third approach.
 A deeper dive into Section 1.41-4 is helpful. Several exam-
ples within Section 1.41-4(a)(8) explain what constitutes ele-
ments of a process of experimentation. One of the examples
includes “design[ing],” “model[ing],” and “simulat[ing]”—
not just “test[ing]”—alternative designs as part of the process
of experimentation to eliminate uncertainties. § 1.41–4(a)(8),
Ex. 4. This suggests that the production of prototypes or pilot
models can be an element of the process of experimentation.
Example 3 concerns a food products manufacturer, X, who
makes a large-shred version of a product. § 1.41–4(a)(8), Ex. 3.
X, seeking to produce a ﬁne-shred version of the product,
machined several thinner blades as alternative designs to pro-
duce a ﬁne-shred version of the food product. Id. X then sys-
tematically tested out these various blades. Id. Notably, the
example does not distinguish the blade production activities
from the testing activities in concluding that substantially all
these activities constituted elements of a process of experi-
mentation. Id. This example, too, tends to show that pilot
model production expenses can be included in the “substan-
tially all” numerator.
 Given the regulation’s apparent inclusion of some pilot
model production activities in the numerator, we hold that
those activities can be research activities (denominator) that
28 No. 21-3145

constitute elements of a process of experimentation (numera-
tor). Our holding does not mean that any direct support or
supervision activities may be considered in the “substantially
all” fraction. Recall that an activity must be a research activity,
whose expenses are deductible under Section 174, to make it
into the fraction at all. See §§ 41(d)(1)(A), (C), 1.41-4(a)(6).
 One more note about Example 3. The production of the
ﬁne-shred blades was an element of a process of experimen-
tation because the blades were used in a “systematic trial and
error process of analyzing various blade designs and materi-
als to determine whether the new shredding blade must be
constructed of a diﬀerent material.” § 1.41–4(a)(8), Ex. 3. And
as discussed above, a process of experimentation “must in-
volve a methodical plan involving a series of trials to test a
hypothesis, analyze the data, reﬁne the hypothesis, and retest
the hypothesis so that it constitutes experimentation in the
scientiﬁc sense.” Union Carbide, T.C. Memo. 2009-50, at *81;
Siemer Milling, 2019 WL 1598588, at *8. Just making a proto-
type model is not enough to pass the process of experimenta-
tion test. The model must be used to evaluate one or more
alternatives using the scientiﬁc method. See § 1.41-4(a)(5)(i);
Union Carbide, T.C. Memo. 2009-50, at *81. “To satisfy the pro-
cess of experimentation test, the taxpayer should develop a
hypothesis as to how a new alternative might be used to de-
velop a business component, test that hypothesis in a scien-
tiﬁc manner, analyze the results of the test, and then either
reﬁne the hypothesis or discard it and develop a new hypoth-
esis and repeat the previous steps.” Union Carbide, T.C. Memo.
2009-50, at *81. This is where Taxpayer failed as a matter of
proof.
No. 21-3145 29

 C. Taxpayer’s Failure of Proof
 The tax court did not decide whether the two vessels were
pilot models. Instead, it performed the “substantially all”
analysis under alternative assumptions that the vessels were
and were not pilot models. We follow the tax court’s lead. Un-
der either assumption, Taxpayer fails the “substantially all”
test.
 1. Assuming the Vessels are Not Pilot Models
 Assuming the vessels are not pilot models, Taxpayer loses
because it failed to show what, if any, portion of the activities
accounted for by the nonproduction wages constitutes ele-
ments of a process of experimentation. If none of the vessels
are pilot models, then none of the production wages would
be included in the “substantially all” fraction. This is because
general production activities unconnected to “the elimination
of uncertainty concerning the development or improvement
of the product are not eligible under section 174.”
§ 1.174-2(a)(2). So under our assumption, the fraction hinges
entirely upon the nonproduction expenses: nonproduction
wages that are for elements of a process of experimentation
divided by nonproduction wages. As we mentioned earlier,
the $609,276 in nonproduction wages are not broken down by
vessel. So we are unable to perform the “substantially all”
analysis at the business component level that Section
41(d)(2)(A) requires—that is, at the vessel level. But the lack
of categorization is just the start. Taxpayer faces a more fun-
damental problem in that many of its nonproduction wages
may account for non-research activities.
 Taxpayer asks us to take on faith that the percentage allo-
cations of each nonproduction employee’s wages were only
30 No. 21-3145

for research activities that involved a process of experimenta-
tion. But Section 41(d) requires us to walk by sight, not by
faith. Taxpayer has the burden to document that the activities
accounted for by the nonproduction wages were elements of
a process of experimentation. United Stationers, 163 F.3d at
443; § 1.41-4(d); see also § 6001; § 1.6001–1(a), (e). The regula-
tions do not require records in any particular form, except that
they must be “in suﬃciently usable form and detail to sub-
stantiate that the expenditures claimed are eligible for the
credit.” § 1.41-4(d). And the “substantially all” test allows for
the fraction to be measured “on a cost or other consistently
applied reasonable basis.” § 1.41-4(a)(6). So ﬂexibility is built
into the test. But shortcut estimates of experimentation-re-
lated activities will not suﬃce. Something more, such as doc-
umentation of time spent on such activities, is necessary. In
any case, the tax court found as a matter of fact that much of
the $609,276 in nonproduction wages accounted for non-re-
search activities.
 The tax court found that CIS’s lead engineer and naval ar-
chitect, Bud Johnson, spent much of his time involved in cus-
tomer relations and management activities. And indeed, trial
testimony supports that Johnson managed payrolls, took care
of personnel issues, interfaced with clients, put together bids,
and handled supply chain concerns. The father-and-son man-
agement team, Don and David Foertsch, were stipulated co-
owners of Taxpayer, and the evidence did not demonstrate
that they conducted much, if any, research activities apart
from their management activities. Don Foertsch was copied
on project-related emails, but none of the emails showed how
his involvement was an element of a process of experimenta-
tion. He would meet with Johnson and David to review bids
and ship designs. Taxpayer also alleged that Don assisted
No. 21-3145 31

with fabrication and production issues, but nothing docu-
ments how he did so. It seems Don played a supervisory role
over research activities. David Foertsch’s testimony regarding
his eﬀorts to “troubleshoot” the Tanker’s towing bridle indi-
cated that he may have engaged in some research activities
that constituted elements of a process of experimentation. He
also testiﬁed about his involvement in designing the stern
notch. But, in the end, the record gave the tax court no means
of determining the extent of time David spent on experimen-
tation-related research activities.
 Another member of management, Alan Fleischmann, was
CIS’s purchasing agent and responsible for assessing and ob-
taining materials for shipbuilding projects. Meunier said
Fleischmann worked with material vendors to procure ship
parts that Johnson requested. Taxpayer’s brieﬁng similarly
described Fleischmann’s activities but also alleged he as-
sessed material alternatives for functionality. Based on the
record, the tax court found that at least some, if not a consid-
erable portion, of Fleischmann’s activities did not involve a
process of experimentation. Finally, the tax court found that
the draftsmen—Dennis Gass, Kyle Harpenau, and Robert Kel-
lems—were not involved in a process of experimentation by
“[s]imply drawing a design provided by an engineer.” In-
deed, Meunier attested that drafting work boils down to in-
putting speciﬁcations into a modeling program to create
drawings. David Foertsch, too, testiﬁed that draftsmen
simply took an engineer’s calculations and produced the
drawings. Without evidence of how the models they pro-
duced were used as part of a scientiﬁc method in evaluating
alternative designs, the tax court had no basis to ﬁnd that the
nonproduction employees’ activities were research activities
32 No. 21-3145

that constitute elements of a process of experimentation. We
ﬁnd no clear error in these factual determinations.
 Like the tax court, we conclude that the record does not
allow us to determine the percentage of nonproduction
employee activities that constituted elements of a process of
experimentation—even less, research activities. Even if we as-
sumed that all $609,276 in nonproduction wages were deduct-
ible under Section 174 and so includible in the denominator,
Taxpayer has failed to demonstrate what, if any part, of that
number belongs in the numerator.
 2. Assuming the Vessels Are Pilot Models
 Assuming the vessels are pilot models, Taxpayer still does
not prevail because it failed to show how such pilot models—
that is, the entire vessels—were used in a process of experi-
mentation. If the vessels are pilot models, the production ex-
penses for them are included in the denominator. 4 See supra
Section III.B.1. Then the “substantially all” fraction would be
as follows: production and nonproduction wages that are el-
ements of a process of experimentation divided by produc-
tion and nonproduction wages. Remember that Taxpayer
claimed the research tax credit on $2,505,491 and $146,109 of
production wages for the Tanker and Dry Dock, respectively.
Again, the fact that the $609,276 in nonproduction wages are
not broken out by vessel presents a problem. We cannot

 4 Even if we reached a different conclusion as to whether pilot model

production activities can constitute research activities and elements of a
process of experimentation, supra Section III.B, the result would not
change for Taxpayer. If the pilot model production expenses were not a
factor in the “substantially all” fraction, then our analysis would be the
same as that performed under the assumption that the vessels were not
pilot models.
No. 21-3145 33

discern a way to factor these wages into the “substantially all”
fraction without a breakdown by vessel.
 The tax court addressed the issue by simply assuming that
all the nonproduction wages were for the Tanker. The court
also assumed that all $609,276 in nonproduction wages were
for elements of a process of experimentation and categorically
excluded pilot model production expenses from the numera-
tor. Using this approach, the tax court found that, at best, the
relevant fraction would be 19.6% ($609,276 ÷ ($609,276 +
$2,505,491))—insuﬃcient to satisfy the “substantially all” test.
For the Dry Dock, the tax court also excluded pilot model
production expenses from the numerator. But, instead of as-
suming that all $609,276 in nonproduction wages were for el-
ements of a process of experimentation, the court calculated
the percentage of nonproduction wages that would need to be
for the Dry Dock alone and included in the numerator in or-
der to satisfy the “substantially all” test: 96% ($584,436 ÷
$609,276 and $584,436 = 0.8 ($584,436 + $146,109)). Because
Taxpayer had not provided suﬃcient information to show its
nonproduction employees’ activities constituted elements of
a process of experimentation, the tax court concluded that the
Dry Dock also did not pass the “substantially all” test.
 We cut a diﬀerent path. Above, we concluded that the
record does not allow us to determine the percentage of non-
production wages that account for elements of a process of
experimentation. We also concluded that much of the nonpro-
duction wages account for non-research activities. Given
these conclusions, we do not strain ourselves with the sequen-
tial assumptions made by the tax court. Because we are
unsure what nonproduction expenses account for research ac-
tivities, we simply exclude them from our “substantially all”
34 No. 21-3145

analysis. This is to Taxpayer’s beneﬁt because, under our pre-
vious conclusions, including the nonproduction expenses
would only increase the denominator without any gains in
the numerator.
 So, whether Section 41(d)(1)(C) is satisﬁed comes down to
whether substantially all of the pilot model production
expenses are elements of a process of experimentation. Re-
member, the process of experimentation test is distinguished
from the Section 174 test in that the former “imposes a more
structured method of discovering information.” Union Car-
bide, T.C. Memo. 2009-50, at *80 (citing Norwest, 110 T.C. at 496
and Eustace, 312 F.3d at 907). A process of experimentation
“involves the identiﬁcation of uncertainty concerning the de-
velopment or improvement of a business component, the
identiﬁcation of one or more alternatives intended to elimi-
nate that uncertainty, and the identiﬁcation and the conduct
of a process of evaluating the alternatives.” § 1.41–4(a)(5)(i).
The tax court found that Taxpayer had provided insuﬃcient
evidence to include the alleged pilot model production ex-
penses for the Tanker and Dry Dock in the numerators of the
respective fractions. We agree.
 Tanker. The tax court began by rejecting Taxpayer’s argu-
ment that the deadweight survey, conducted after the Tanker
was built, established that the entire tanker was involved in a
process of experimentation. But it also viewed with skepti-
cism the Commissioner’s argument that the survey was
merely a quality control test that was not a process of experi-
mentation or deductible research under Section 174. See gen-
erally §§ 1.174-2(a)(6)(i), 1.41-4(c)(5)(v). We do not share the
tax court’s hesitation on this point. The deadweight survey
determines a vessel’s water displacement, which indicates its
No. 21-3145 35

cargo capacity. Water displacement is a common contractual
speciﬁcation for vessels, and a suﬃcient variance can result in
noncompliance with agreed-to terms. So the deadweight sur-
vey is closer to a quality control test that determines whether
a customer’s speciﬁcations have been met, § 1.174-2(a)(7), ra-
ther than a “methodical plan involving a series of trials to test
a hypothesis, analyze the data, reﬁne the hypothesis, and re-
test the hypothesis.” Union Carbide, T.C. Memo. 2009-50, at
*81; Siemer Milling, 2019 WL 1598588, at *8. No hypothesis was
postulated, and no alternatives were evaluated. The test pri-
marily addressed one question: Does the vessel conform to
the customer’s cargo requirements?
 We do not doubt that Taxpayer encountered many uncer-
tainties in building the Tanker. Plenty of trial testimony
demonstrated that changes in one of several interdependent
vessel components could trigger the redesign of other parts.
But we suspect that much of this design spiral addressed ge-
neric manufacturing uncertainty, rather than “investigative”
uncertainty “in developing the concept of a model or product.”
Union Carbide, T.C. Memo. 2009-50, at *79 (quoting Mayrath,
41 T.C. at 590). The tax court found that Taxpayer had not
established that post-fabrication testing was required to de-
termine the design of every component of the Tanker that dif-
fered from its predecessor, the Penn 80. We agree and add that
Taxpayer has not shown what expenses claimed for the whole
Tanker were elements of a process of experimentation to
remove uncertainty related to the “development or improve-
ment” of the product. §§ 1.41-4(a)(5)(i), 1.174-2(a)(1). Sure, ex-
penses incurred to iteratively design the Tanker’s stern notch
and towing bridle (among other parts) may have involved a
process of experimentation. But Taxpayer failed to give us the
means to apply the shrinking-back rule to apply the
36 No. 21-3145

“substantially all” test to any subcomponent of the Tanker. See
generally § 1.41–4(b)(2). By choosing an “all or nothing” strat-
egy, Taxpayer swung for the fences and missed. Assuming the
Tanker is a pilot model, Taxpayer still failed to satisfy the
“substantially all” test with respect to the Tanker.
 Dry Dock. The tax court found that CIS’s partial raise-and-
lower test for the Dry Dock did not establish that the design
of every element of the vessel remained uncertain, and thus
constituted a process of experimentation. This raise-and-
lower test, too, is less experimentation than it is a quality con-
trol test that establishes whether a customer’s speciﬁcations
have been met. § 1.174-2(a)(7). It merely ascertains whether a
dry dock submerges and rises as designed and according to a
customer’s desired parameters. In fact, the client, Detyens—
not CIS—conducted a full raise-and-lower test after taking de-
livery of the vessel at its shipyard. This supports the under-
standing that the raise-and-lower test conﬁrmed the vessel’s
functioning as designed. Its primary function was not to test
any hypothesis or evaluate alternatives CIS had in mind.
 We recognize that the Dry Dock is the ﬁrst one that CIS
built. But we reiterate that the novelty of a business compo-
nent is not a proper heuristic for the “substantially all” test.
The test is applied in reference to research activities—not the
business component being developed or improved.
§ 1.41-4(a)(6). We also acknowledge the many uncertainties
Taxpayer encountered while building the Dry Dock. Surely,
Taxpayer engaged in some research activities to address these
uncertainties. But Taxpayer failed to document what, if any,
of these activities involved a “methodical plan involving a se-
ries of trials to test a hypothesis, analyze the data, reﬁne the
hypothesis, and retest the hypothesis.” Union Carbide, T.C.
No. 21-3145 37

Memo. 2009-50, at *81; Siemer Milling, 2019 WL 1598588, at *8.
Taxpayer simply said the Dry Dock is ﬁrst-in-class and did
not document whether hypotheses and alternatives were
tested and reﬁned in a scientiﬁc manner. True, the Dry Dock’s
outboard side plate and safety deck, among other parts, went
through several design iterations, the research activities for
which could constitute elements of process of experimenta-
tion. But again, we are unable to apply the shrinking-back rule
on such subcomponents for lack of documentation. See gener-
ally § 1.41–4(b)(2). Assuming the Dry Dock is a pilot model,
Taxpayer also failed to satisfy the “substantially all” test with
respect to the Dry Dock.
 IV. Conclusion
 For both vessels, Taxpayer failed to provide a principled
way to determine the portion of employee activities that con-
stituted elements of a process of experimentation. Instead,
Taxpayer oﬀered arbitrary allocations for nonproduction em-
ployee wages that estimate the portion of the employee’s time
spent on qualiﬁed research. These allocations were not broken
out by vessel and did not adequately document that nonpro-
duction employees performed research activities which con-
stitute elements of a process of experimentation. Taxpayer
also claimed production employee wages, but similarly failed
to show that the production activities accounted for by these
wages were elements of a process of experimentation—even
less, research activities. The pilot model argument does not
help because, even assuming the vessels were pilot models,
Taxpayer did not show why the alleged model production ex-
penses belonged in the “substantially all” numerator. Tax-
payer therefore failed to bear its burden to provide enough
evidence for this court to calculate the “substantially all”
38 No. 21-3145

fraction “on a cost or other consistently applied reasonable
basis.” § 1.41-4(a)(6).
 The lesson for taxpayers seeking to avail themselves of the
research tax credit is to adequately document that substan-
tially all of such activities were research activities that consti-
tute elements of a process of experimentation. Generalized
descriptions of uncertainty, assertions of novelty, and arbi-
trary estimates of time performing experimentation are not
enough.
 AFFIRMED.